203 N.J. Super. 297 (1985)
496 A.2d 1111
IN THE MATTER OF THE HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION LOCAL 54.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1985.
Decided July 11, 1985.
*306 Before Judges MATTHEWS, FURMAN and HAVEY.
Michael N. Katz argued the cause for Hotel and Restaurant Employees and Bartenders International Union Local 54 (Meranze and Katz, attorneys; Bernard N. Katz, of counsel).
Ronald F. Kidd, admitted pro hac vice, argued the cause for appellants Gerace, Materio and LaSane (Duane, Morris & Heckscher, attorneys; Steven M. Janove, and Harry Horwitz of Davis, Reberkenny & Abramowitz, of counsel).
John R. Zimmerman, Senior Assistant Counsel, argued the cause for respondent New Jersey Casino Control Commission *307 (Thomas N. Auriemma, Deputy Director/Legal Division, and Leonard J. DiGiacomo Assistant Counsel, on the brief).
Eugene M. Schwartz, Deputy Attorney General, argued the cause for respondent State of New Jersey, Division of Gaming Enforcement (Anthony J. Parrillo, Assistant Attorney General, of counsel; Gary A. Ehrlich, Deputy Attorney General, of counsel and on the brief with Mr. Schwartz).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
From June to September 1982, the Casino Control Commission conducted hearings to determine whether certain officials of the Hotel and Restaurant Employees and Bartenders International Union Local 54 were disqualified under Section 86 of the Casino Control Act, N.J.S.A. 5:12-1 to N.J.S.A. 5:12-152 (the act). Pursuant to Section 93(a) of that act, Local 54 had filed an annual registration statement with the Commission. N.J.S.A. 5:12-93(a). The Division of Gaming Enforcement was then requested to review the credentials of the Union and its personnel as mandated by N.J.S.A. 5:12-94(a).
On May 11, 1982, the Division submitted a letter report to the Commission in which it urged that Section 93 sanctions be imposed against several union members. Among the individuals said to be disqualified by the act were the President, Frank Gerace, and Business Manager, Frank Materio. On April 30, 1982, the Division filed another report in which it cited two additional union employees, Eli Kirkland[1] and Karlos LaSane, as disqualified under the act.
On September 28, 1982, the Commission issued a determination in which it found Gerace and Materio disqualified under Section 86(f), and LaSane disqualified under Section 86(c). The Commission applied Section 93(b) which prohibits the Union *308 from receiving dues from its employees or from administering pension or welfare funds if any of its officers, agents or principal employees is disqualified by Section 86 of the act. N.J.S.A. 5:12-93(b).[2] Frank Gerace, Frank Materio, Karlos LaSane and the union have appealed the adverse decision.
Local 54 represents approximately 14,000 hotel workers, 10,000 of whom are employed in casino hotels in Atlantic City. The Local's members are employed in non-gaming positions including waiters, kitchen workers, bartenders, and porters.
In 1979 Frank Gerace was elected as President of Local 54, and was re-elected to that position in June 1982. As chief executive officer, Gerace was authorized to hire and discharge business agents, oversee daily union activities, and engage in collective bargaining on behalf of the Local's members. Frank Materio became an employee of Local 54 in mid-1978. On June 30, 1978, pursuant to a motion made by Gerace, Materio was accepted by Local 54's Executive Board as a union organizer. Materio was appointed to the Executive Board as trustee on January 16, 1979. Karlos LaSane was employed by Local 54 on May 4, 1981 to represent union members at grievance hearings. LaSane also was designated by Gerace as Local 54's affirmative action officer.
Section 86, of the act, N.J.S.A. 5:12-86, sets out the criteria under which an applicant will be denied a license. Among those criteria pertinent here are subsections c and f. N.J.S.A. 5:12-86(c) mandates the disqualification of any applicant who has been convicted of certain enumerated crimes under New Jersey law. N.J.S.A. 5:12-86(f) disqualifies any applicant identified as a "career offender or a member of a career offender cartel" or one who is "an associate of a career offender or a career offender cartel in such a manner which creates reasonable belief that the association is of such a nature as to be inimical *309 to the policy of this act...." (emphasis provided.) N.J.S.A. 5:12-86(f). However Section 93(b) also permits the Commission, at its discretion, to waive the disqualifying criteria. N.J.S.A. 5:12-93(b).
In its letter of May 11, 1982, the Division alleged that Gerace and Materio were disqualified under Section 86(f) by reason of their association with certain career offenders or career offender cartel members. LaSane was claimed to be disqualified under Section 86(c) by reason of a prior criminal conviction. Two issues were directed to the Commission with respect to Gerace and Materio: first, whether Gerace and Materio were associated with members of a career offender cartel, and second, whether that association was of such a nature so as to create a reasonable belief that it was inimical to the policy of the act and to gaming operations. The issues directed to the Commission with respect to LaSane were whether he was an officer, agent or principal employee of Local 54 within the meaning of the act, and whether the Commission should waive his disqualification as permitted by N.J.S.A. 5:12-93(b).
The Division presented extensive evidence to suggest a relationship between Gerace and Materio and career offenders, especially one Nicodemo Scarfo. Testimony at the 1982 hearings concerned Scarfo, the Bruno crime family, and all possible implications between Scarfo and Local 54 members. At the conclusion of the testimony, the Commission made detailed findings of fact regarding the possibility of a relationship between the Union officials and Scarfo, and its extent.
The Commission found that Nicodemo Scarfo has led the Bruno organized crime family since March 1981. The "Bruno family," which operates in the Philadelphia metropolitan area and southern New Jersey, including Atlantic City, was named after its former head, Angelo Bruno. Bruno was murdered in March 1980. Philip Testa assumed control of the "family" following Bruno's death, until he was murdered in March 1981.
*310 The Commission also found that Scarfo had a lengthy history of criminal involvement, beginning in March 1950 when he was convicted of setting up an illegal lottery. He entered a plea of guilty to involuntary manslaughter in 1964, and most recently, was convicted of possession of a firearm by a convicted felon in 1981. The Commission concluded that Scarfo is a career offender and an active member of a career offender cartel.[3]
The Commission evaluated the evidence concerning the relationship between Gerace and Materio and Scarfo. It found six areas in which an association between Scarfo and Local 54's officers is evidenced.
The Division first submitted a telephone list as indicative of Scarfo's association with Gerace and Materio. The telephone list was seized from Scarfo in December 1979 following his arrest for the murder of Vincent Falcone. Some of the names on the list were aliases and many of the numbers were encoded. After deciphering the code, the law enforcement officers determined that several encoded names and numbers related to associates of Scarfo who have been linked to organized criminal activity. Other names and numbers listed in the book were not encoded, such as dentists and attorneys.
The Commission determined that five employees of Local 54 were listed in Scarfo's phone book under aliases. Frank Gerace was listed under the name "Percy," and his number was in code. Gerace's mother was listed as "Percy Mom," and Susan Holland, Branch Manager of William L. Meyers, Inc., Administrator of Local 54's Health and Welfare Fund, was listed as "Percy Girl." Both women were listed with coded numbers. Materio's number was also on Scarfo's phone list. However, Materio was listed by his proper name and his numbers were uncoded. In addition, Robert Lumio, Secretary-Treasurer of Local 54 from September 1979 to June 1981, and Frank Lentino, *311 Business Agent for Local 54 since 1981, were listed under aliases.
In December 1979, the police found another piece of evidence indicative of Scarfo's interest in Local 54. During their investigation of the Falcone murder, the police seized a piece of paper from Scarfo's dresser drawer containing the words:
KIS-POTS-GON ALL OUT BACK TO 54 ST. BEFORE FEB.
The Commission found that the note referred to Thomas Kissick, Ernest Potts, and Thomas "Goony" Walsh, and their removal as union officials when Local 491 merged with Local 54 in September 1980. The Commission held that the paper evidenced both Scarfo's interest in the unions, and his advance notice of the unions' activities.
The third basis on which the Commission disqualified Gerace and Materio involved the events leading to Scarfo's arrest for the Falcone murder. Shortly after their arrest, Scarfo and his two associates, Leonetti and Merlino, were released on $92,000 cash bail. Twenty thousand dollars of that amount was provided by Gerace's mother. At the hearing, the Division presented documentary evidence that half of Lillian Gerace's contribution was supplied by appellant Frank Gerace.
In addition, after their release, Materio put up his house as property bail for Leonetti and Merlino, so that part of the cash bail could be released. Despite this, Materio testified that he did not know Leonetti and Merlino personally and that he agreed to use his home for bail as a favor to Scarfo's mother, a personal friend. Materio further testified that he had known Scarfo for 25 years, although he had only seen him 6 to 7 times in the prior 5 years.
The Commission next relied on the immunized testimony of Joseph Salerno. Salerno is the principal witness against Scarfo, Leonetti and Merlino in their trial for the murder of Vincent Falcone. Salerno was a plumber in New Jersey. In 1978, when he encountered financial problems, Salerno approached Leonetti for a loan. In June 1979, Salerno had marital problems and *312 Leonetti allowed him to stay at his premises. From September 1979 to December 1979, Salerno resided at 26-28 North Georgia Avenue, in Atlantic City. During that time, Salerno had frequent contact with Scarfo, Leonetti, Merlino, and Lumio, who was then the Secretary-Treasurer of Local 54.
On several occasions Salerno overheard Scarfo indicate that he controlled the unions. Salerno testified, for example, that on one occasion Scarfo told Lumio that: "I got you your job and I got that other big fat j-o his job and don't you forget it." Salerno also testified that during his stay at 26-28 North Georgia Avenue, he saw Gerace in Scarfo's company 11 or 12 times. Salerno stated that three to four meetings were held at Scarf, Inc., a company owned and operated by Scarfo. Meetings between Gerace and Scarfo were also held at Scarfo's apartment and outside the premises of 26-28 North Georgia Avenue. Salerno stated, however, that he never overheard Gerace and Scarfo's conversation and never heard them say anything to each other regarding Local 54 and union business.
The Commission also heard evidence about Local 54's dealings with Scarfo associates and cited Robert Lumio, Albert Daidone, Joseph Erace, and Frank Lentino, in addition to Gerace and Materio, as present or former employees of Local 54 who are connected to Scarfo.
Robert Lumio was appointed by Gerace to fill the office of Secretary-Treasurer in August 1979. As previously mentioned, Salerno testified with respect to Lumio's ties to Scarfo. In addition, State agents testified they saw Lumio in the company of Scarfo and Leonetti on several occasions. Albert Daidone became Local 54's business agent for the Camden office in December 1980. Less than four months later, Gerace appointed Daidone to the Executive Board of Local 54. In June 1981, Daidone was appointed Vice President of Local 54 following the death of Robert Lumio. Daidone was an admitted friend of Natale and Angelo Bruno. Natale was described by FBI *313 agents as "a major distributor of illegal drugs" and "a very close associate of Angelo Bruno."
The Commission found that Joseph Erace was the third member of Local 54 with connections to Scarfo. On December 14, 1981, Gerace appointed Erace to the Executive Board of Local 54. Donna Savarese, lounge manager at the Tropicana Casino Hotel, testified to the Commission that on February 6, 1982, Erace approached her and stated that he wanted to introduce her to a friend named Nick Scarfo.
Frank Lentino is the last Local 54 employee with alleged ties to Nick Scarfo. On June 8, 1981, Gerace appointed Lentino as Camden County Office Manager. Lentino appears on the Scarfo telephone list, previously described, under the name Frank Gray, with a coded number. Lentino is also a proposed alibi witness for Scarfo in connection with the Falcone murder. Thus, the Commission found that there are six present or former employees of Local 54, Gerace, Materio, Lumio, Daidone, Lentino, and Erace who are connected to Scarfo or other members of the Bruno crime family.
The Commission also found connections between Local 54's business dealings and persons or firms tied to Scarfo. The Division first presented evidence that a company hired by Local 54 to perform union headquarters renovation work was connected with Scarfo. In January 1979, Local 54's Executive Board approved a renovation of the union headquarters and authorized the officers to seek the best union contractors for the job. Toro Construction Company became the general contractor for the renovations. Toro is a legitimate company and was one of four or five contractors recommended to Gerace by John Rich, business agent for Local 33. Although there is no evidence of any irregularity in the way Toro obtained contracts or performed work for Local 54, Toro had contributed $44,000 in cash to the bail for Scarfo, Leonetti and Merlino following their arrest for the Falcone murder. In addition, Rick Casale, roofing *314 contractor who did the roofing work on the renovation of Local 54 headquarters, is a "very close associate of Scarfo."
In 1979 Local 54 sold its headquarters building for $175,000. Part of the real estate commission was earned by one Vincent Sausto, an insurance broker and real estate agent who handles insurance policies for Scarfo and his relatives, and who has been seen on the premises of Scarf, Inc.
The Division also produced evidence concerning business dealings between Affiliated Leasing Systems, Inc. and Local 54. In March 1979, Affiliated Leasing Systems, Inc. leased a car to Philip Leonetti. On December 18, 1979, Robert Wayne, an account executive with Affiliated, had occasion to go to the offices of Scarf, Inc. to deliver a vehicle. While at Scarf, Inc. headquarters, Scarfo suggested to Wayne that he contact Local 54 with regard to the possible leasing of other vehicles. As a result, Affiliated leased two vehicles to Local 54.
Testimony also was presented on behalf of Gerace and Materio. Sixteen witnesses, including Joseph Menardy, Business Manager of Local 334, Charles Marciante, President of the New Jersey AFL-CIO, and William G. Rosenthal, Esq., of Shaw & Rosenthal, testified that Gerace was a dedicated and responsible union leader. The Commission found that the testimony on the behalf of Local 54 was uncontradicted.
The Commission found, however, viewing the record as a whole, that the association of Gerace and Materio with Nicodemo Scarfo was inimical to the policy of the act and to gaming operations. The Commission further held that once the influence of a career criminal such as Scarfo has been shown, the State need not wait for its detrimental effect on the union to become manifest. Materio and Gerace were, thus, disqualified under Section 86(f) of the act.
The Division also presented evidence for the disqualification of Karlos LaSane. LaSane has been employed with Local 54 since May 4, 1981. LaSane represents union members employed *315 at Bally's Park Place and Caesar's Boardwalk Regency at grievance hearings. LaSane testified that he attends grievance hearings, speaks on behalf of union members and attempts to resolve whatever problems exist between the employees and management. LaSane has also been designated as Local 54's affirmative action officer. The Commission found that LaSane is an "agent within the meaning of N.J.A.C. 19:41-12.1."
The Division sought to disqualify LaSane on the basis of his prior criminal record. LaSane was convicted in the United States District Court for the District of New Jersey on May 21, 1973, of interference with commerce, aiding and abetting and conspiracy in violation of 18 U.S.C.A. § 1951. From May 21, 1968, until the time of his indictment, LaSane was, as a Commissioner of the City of Atlantic City, Director of Parks and Public Property. According to the indictment, LaSane obstructed and delayed the construction of public projects, purchases of goods, and the licensing of firms which sought to do business with the City of Atlantic City. The offense for which LaSane was convicted is equivalent to a violation of N.J.S.A. 2C:20-5(d). This offense is listed as a disqualifying offense in Section 86(c)(1) of the Casino Control Act. N.J.S.A. 5:12-86(c)(1). The Commission found that LaSane was acting in his official capacity as Commissioner of the City of Atlantic City when he committed the acts which constituted the federal crime. The Commission chose to disqualify LaSane based on his prior conviction, pursuant to N.J.S.A. 5:12-86(c).

I.
Appellants do not dispute that Scarfo is a career offender or that Gerace had a social relationship with Scarfo at one time. They contend, however, that the circumstantial evidence before the Commission did not support a finding of influence "inimical" to the policies of the act within the meaning of N.J.S.A. *316 5:12-86(f). The State[4] contends the evidence amply supports the Commission's finding that Gerace and Materio operate Local 54 under Scarfo's influence and that the inimical criterion is therefore satisfied.
The standard of reviewing the Commission's factual findings was established in In re Boardwalk Regency Casino License Application, 180 N.J. Super. 324 (App.Div. 1981), aff'd as mod., 90 N.J. 361 (1982), app. dism. sub. nom., Perlman v. Attorney General, 459 U.S. 1081, 103 S.Ct. 562, 74 L.Ed.2d 927 (1982). We held that an appellate court is obligated to determine whether the findings of fact:
could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard for the opportunity of the Commissioners who heard the witnesses to judge of their credibility. [180 N.J. Super. at 333].
The appellate review calls for a careful and principled consideration of the agency's record and findings resting upon a determination of the worth, plausibility and consistency of that record. Mayflower Securities Co. v. Bureau of Securities, 64 N.J. 85 (1973). As we stated in Boardwalk Regency, if it appears that the Commission's findings might reasonably have been reached from sufficient credible evidence,
[W]e will not disturb them even in cases in which, had we been doing it, we would have done it differently. Proper respect for the obligation of the agency to accomplish its statutory obligations and consideration for implementation of the legislative intent in the manner designed by the Legislature causes us to proceed with especial restraint in agency matters. [180 N.J. Super. at 334].
The essential question before the Commission was whether the association between Scarfo and members of Local 54 was "inimical" within the meaning of Section 86(f), N.J.S.A. 5:12-86(f). Webster's Third New International Dictionary defines inimical as "harmful or adverse." Webster's Third New International Dictionary, G. & C. Merriam Co., (1971). *317 Thus, if the Commission had "reasonable belief" that the association between appellants and Scarfo was adverse to the policy of the act and gaming operations, it was obligated to disqualify the labor organization under Section 93. N.J.S.A. 5:12-86(f); N.J.S.A. 5:12-93(b).
The public policy of the State as expressed in the act, necessitates a strong state regulatory interest in all aspects of casino activities. N.J.S.A. 5:12-1(b)(6). The State's interest extends to those labor organizations which represent state-licensed or registered casino hotel workers. N.J.S.A. 5:12-93. Of paramount concern to the Legislature was the exclusion from participation in the gaming industry of all persons with known criminal records, habits or associations. N.J.S.A. 5:12-1(b)(7). Because labor organizations have the power to involve themselves materially in the operation of casino hotels, regulatory supervision of such organizations was deemed critical. The State Commission of Investigation, in advocating the adoption of what is now Section 93, noted that there were:
few better vehicles utilized by organized crime to gain a stranglehold on an entire industry than labor racketeering. [Report and Recommendations on Casino Gambling by the New Jersey State Commission of Investigation (April 1977) at 1-14]
The Legislature intended by enacting Section 93, to enable the Commission to regulate labor organizations and, thus, prevent members of organized crime from affecting the casino industry through labor unions. See Brown v. Hotel and Restaurant Employees and Bartenders International Union Local 54, 468 U.S. ___, ___-___, 104 S.Ct. 3179, 3182-3184, 82 L.Ed.2d 373, 379-380 (1984).
In view of the legislative background, a properly supported finding of influence by Scarfo over Gerace and Materio would be sufficient to disqualify the two union members under N.J.S.A. 5:12-86(f). Appellants concede a showing of actual influence would disqualify them. They contend however, that the Commission's conclusions are not supported by sufficient *318 evidence that either Gerace or Materio were subject to the influence of Scarfo.
The evidence cited by the Commission to support its conclusion that Scarfo influenced Gerace and Materio includes: (1) Scarfo's phone list; (2) the fact that appellants helped Scarfo obtain his release on bail in 1979; (3) the testimony of Joseph Salerno; (4) union appointments with alleged ties to Scarfo; and (5) business dealings between Local 54 and Scarfo associates. Appellants contend this evidence does not support the Commission's findings that Scarfo exerted actual influence over them. With respect to the telephone list, the Commission concluded:
It can be inferred that the persons on the list are those who Scarfo had occasion to speak with or anticipated that he might have an occasion to speak with on the telephone. In view of the constant attention he receives from the police, it can further be inferred that he kept certain numbers in code because he did not want evidence of his association with those persons to fall into the hands of the authorities. The appearance of five Local 54 employees on the list is evidence of Scarfo's interest in the Union and access to its leaders ...
Appellants argue that the phone list demonstrated nothing more than Scarfo's interest in Local 54 and should be disregarded. The State admits that the phone list, by itself, is not conclusive as to Scarfo's influence over Gerace and Materio, however, the State contends that it is not without value.
Similarly, appellants allege the coded message confiscated from Scarfo in 1979 is not indicative of Scarfo's influence over Gerace and Materio. The message did not refer to either appellant Gerace or Materio. Appellants, however, do not challenge the Commission's conclusion that the message evidenced Scarfo's interest in the union.
The Commission secondly points to bail money posted by Gerace and Materio for the release of Scarfo, Leonetti and Merlino after their arrest for the murder of Vincent Falcone. Gerace contends he supplied Scarfo with $10,000 at his mother's request. Gerace further contends the Commission found that the transaction was open and legitimate. The Commission concluded, however, that Gerace would not risk a major portion *319 of his savings for an organized crime figure unless "motivated by some strong sense of obligation or loyalty."
Materio also claimed that he put up his house as property bail for Leonetti and Merlino as a favor to Scarfo's mother. Materio testified that he knew Scarfo casually, Leonetti only by sight, and that he did not know Merlino at all. The Commission found Materio's explanation unconvincing. The Commission concluded:
We cannot believe that [Materio] would put up his house, over the objection of his wife, as bail for people he barely knew. Even if he thought he was putting up bail for Scarfo, or as a favor to Catherine Scarfo, we cannot believe he would do so if his relationship with these people was as casual as he claims.
The Commission also relied on the testimony of Joseph Salerno as evidence of Scarfo's influence over Gerace and Materio. Salerno had frequent contact with Scarfo, Leonetti, Merlino and Lumio. Salerno testified that Scarfo indicated he owned the unions and that he placed Lumio and Gerace in their jobs. Salerno also testified that Gerace was a frequent visitor of Scarf, Inc. and that Scarfo and Gerace had many private conversations. The Commission found Salerno to be a credible witness and, therefore, took his testimony into consideration.
Appellants argue that Salerno, a confessed "gangster," is not a credible witness. They point out that Salerno perjured himself in testimony before the United States Senate Subcommittee on Investigation regarding Gerace's meetings with Scarfo. Salerno testified before the Senate Subcommittee that he overheard Gerace and Scarfo discuss affairs of Local 54. It was not until he was cross-examined by Gerace's counsel that Salerno admitted he never overheard any conversation between Gerace and Scarfo and had merely assumed they discussed union business. Appellants urge this court to discredit Salerno's testimony on the basis of his prior perjured testimony.
The State argues that Salerno's credibility could only be judged by the Commissioners who were present during the proceedings, and who found Salerno's assumption that Gerace and Scarfo discussed union business understandable in light of *320 the frequency of their conversations, and Scarfo's prior statements about controlling the unions.
The Commission also listed appointments to union offices of persons tied to Scarfo and business dealings of Local 54 with persons or firms tied to Scarfo, as indicative of an influence "inimical" to the policies of the act. The Commission first noted that Gerace and Materio were responsible for appointing to union offices several associates of Scarfo, including: Robert Lumio, Albert Daidone, Joseph Erace and Frank Lentino. Appellants contend that all individuals appointed to union positions were qualified for the job. In fact, the Commission conceded that none of the disputed appointees acted illegally or improperly in the conduct of union affairs. Materio also argues that his participation simply consisted of his making a formal motion that the individuals be accepted. His disqualification, he claims, is based on "guilt by association."
Actually, it is irrelevant that appellants' appointments involved qualified individuals. Permitting the infiltration into the union's official positions by friends of organized crime is intrinsically wrong. Furthermore, Materio's participation, was not as innocent as he indicates.[5] For example, the Commission heard testimony regarding a scheme whereby Salerno would contract for the plumbing work for the renovation of Local 54 headquarters at an inflated rate and would then split the profit with Lumio and Leonetti. Although present when this scheme was proposed, Materio did not attempt to intercede. The plan never materialized due to Salerno's other business commitments.
The Commission finally listed a series of Local 54's business dealings with ties to Scarfo associates and concluded:

*321 [T]he appointments and business associations, when viewed in the light of the evidence concerning Scarfo's interest in the union and access to its leaders, ... renders it impossible to ascribe them to coincidence or to anything other than Scarfo's influence over Gerace and Materio.
As with the union appointments, appellants attempted to refute the Commission's findings by evidence that there were no irregularities evidenced in any of these business dealings. The relevant point is not whether the challenged business associations are themselves improper, but whether they constitute evidence of an external influence on Local 54.
In conclusion, the Commission had a record replete with circumstantial evidence of Scarfo's influence over Gerace and Materio. The evidence manifests itself in the union officials' personal relationship with Scarfo as well as in their business relationships with Scarfo associates. The sheer number of ties to Scarfo renders incredible an innocent explanation. The Commission considered the legislative intent, as expressed in N.J.S.A. 5:12-1, of preventing organized crime members from affecting the casino industry through labor unions, and found:
[O]nce the influence of a career criminal such as Scarfo has been shown, we need not wait for its inevitable detrimental effect on the Union and ultimately on the casino industry to become manifest before we can act. The fact of influence by a person such as Scarfo is inimical to the policy of the Act and gaming operations.
Considering the record as a whole, we conclude that the findings of fact are supported by sufficient credible evidence.

II.
Appellants argue that the freedom of association embodied in the First Amendment protects Gerace's and Materio's relationship with Scarfo, and because it does, such a relationship cannot be restricted based on the State's interest in preventing corruption in the gaming industry. In its decision to disqualify Gerace and Materio, the Commission found that these individuals were operating Local 54 under the influence of Scarfo in a manner that is inimical to the policies of the Casino Control Act. Gerace and Materio argue that because the Commission found *322 no evidence of impropriety or misconduct, they were being disqualified solely because of their "social association" with Scarfo. The State argues that the constitutional question is restricted to whether the First Amendment protects a relationship in which union officials are influenced by members of organized crime. We are asked to determine the bounds of the freedom of association and whether appellants' activity is protected by the First Amendment guarantees. We also must determine whether the State has a "compelling interest" in prohibiting appellants' association with Scarfo, and whether the means chosen were "closely drawn" to the purpose of the act.

A.
The right of association, which is not specifically mentioned in the First Amendment, has been recognized as incident to the rights of free speech and assembly. It was first acknowledged as a necessary means to promote effective advocacy and the "advancement of beliefs." N.A.A.C.P. v. Alabama, 357 U.S. 449, 460-462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), reh. den., 361 U.S. 856, 80 S.Ct. 43, 4 L.Ed.2d 96 (1959). In recent decisions, courts have expanded the right to include associations with no overtly political purpose.
In Roberts v. United States Jaycees, 468 U.S. ___, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court determined that the constitutionally protected right to association has developed in two areas. 468 U.S. at ___, 104 S.Ct. at 3249, 82 L.Ed.2d at 471. In analyzing prior cases, the Supreme Court concluded that:
In one line of decisions ... choices to enter and maintain certain intimate human relationships must be secured against undue intrusion by the State.... In another set of decisions, the Court has recognized a right to associate for the purpose of those activities protected by the First Amendment  speech, assembly, petition for the redress of grievances, and the exercise of religion. [468 U.S. at ___, 104 S.Ct. at 3249, 82 L.Ed.2d at 471]
Appellants concede their past associations with Scarfo did not involve the advancement of political or religious matters. Instead, they allege that their First Amendment right is protected *323 by the first line of court decisions, those which protect certain "intimate human relationships."
In Roberts, however, the Court recognized that the right to associate is not absolute:
Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated attachments.... We need not mark the potentially significant points on this terrain with any precision. We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics.... [468 U.S. at ___, 104 S.Ct. at 3251, 82 L.Ed.2d at 473]
Lower courts have reinforced an individual's right to freedom of association as defined in Roberts. For example, in Wilson v. Taylor, 733 F.2d 1539 (11 Cir.1984), the Court held that it was improper to discharge a police officer based solely on his dating relationship with the daughter of a convicted felon and reputed organized crime figure. 733 F.2d at 1540. The Court found the officer's relationship protected by the First Amendment. The Court of Appeals had expressly noted, however, in a prior decision in the same case, that Wilson had not contested the lower court's finding that association with the father, a known felon and reputed leader of organized crime, was not a constitutionally protected right. 658 F.2d 1021, 1027 (5 Cir.1981).
Similarly, in Bruns v. Pomerleau, 319 F. Supp. 58 (D.Md. 1970), the district court ruled that the police department's refusal to hire an otherwise qualified individual, solely because he belonged to an organization of nudists, violated the First Amendment. The court, nevertheless, recognized the Department's interest in the behavior of its officers off-duty as well as on. 319 F. Supp. at 67. The officer's activities, the court held, could be limited only by such associations as were "inimical to the Department." 319 F. Supp. at 67.
Several other courts have extended the freedom of association. Sawyer v. Sandstrom, 615 F.2d 311 (5 Cir.1980), involved an overly broad loitering ordinance which punished an individual for his act of being in a public place and associating with *324 individuals whom he knew were unlawfully possessing or using drugs. 615 F.2d at 316. The court held that this was an impermissible infringement on his freedom of association. 615 F.2d 311. The Second Circuit also held that an individual's associational right is protected by the First Amendment. McKenna v. Peekskill Housing Authority, 497 F. Supp. 1217 (S.D.N.Y. 1980), mod. on other grounds 647 F.2d 332 (2 Cir.1981). McKenna involved the invalidation of a public housing authority regulation which required the registration in advance of guests wishing to visit tenants. 647 F.2d at 332. In Fisher v. Snyder, 346 F. Supp. 396 (D.Neb. 1972), aff'd, 476 F.2d 375 (8 Cir.1973), a female public school teacher was terminated because she had male overnight guests. The court held that the teacher's right to associate was violated. 346 F. Supp. at 399. In Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), reh. den. 366 U.S. 978, 81 S.Ct. 1912, 6 L.Ed.2d 1267 (1961), the Supreme Court invalidated portions of the Smith Act, 18 U.S.C. § 2385, which prohibited membership in any organization advocating the overthrow of the government by force. The Court held that the statute was unconstitutional to the extent that it prevented the mere membership in an organization. 367 U.S. at 228, 81 S.Ct. at 1485.
The State argues that although these cases expand the protected right of association, they do not address the facts as found by the Commission in the present case. Lewitus v. Colwell, 479 F. Supp. 439 (D.Md. 1979) is the most significant federal decision regarding the legitimacy of state regulations of interactions with criminals by persons involved in gaming operations. In Lewitus, an applicant for a Maryland racehorse owner's license was denied licensure because of his association, partially social and partially business-related, with an individual who had been involved in illegal racetrack practices. The Court held that the State had a valid interest in maintaining the integrity, as well as the appearance of integrity, of the gaming industry. 479 F. Supp. at 448. The court concluded that the applicant's association was not protected by the First Amendment. *325 Id. Although the Lewitus court's rationale reflected a more narrow reading of the scope of protected association than that advocated more recently in Roberts v. United States Jaycees, it cannot be dismissed as suggested by Gerace and Materio. In light of the finding by the court of an inference of illegal influence, the Lewitus decision still would be valid under the broader view of the First Amendment right as taken in more recent cases. [See e.g., Wilson v. Taylor, 658 F.2d 1021, 1027 (5 Cir.1981)].
The most relevant New Jersey case suggests the same result. Niglio v. New Jersey Racing Commission, 158 N.J. Super. 182 (App.Div. 1978). In Niglio, the Racing Commission barred the spouse of a disqualified person, not solely on grounds of the marital relationship, but because of the spouse's dependence on and influence by the disqualified individual. This court found no associational rights implicated by the Commission's decision.
There are other New Jersey cases which have denied licenses or other governmental privileges to applicants under the influence of a disqualified individual, without the suggestion that the denial implicated First Amendment rights. See, e.g., In re Disciplinary Hearings Against Schmidt, 79 N.J. 344, 352-353 (1979); Trap Rock Industries, Inc. v. Kohl, 59 N.J. 471, 481-482 (1971), cert. den., 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Florence Methodist Church v. Florence Twp. Comm., 38 N.J. Super. 85, 88-90 (App.Div. 1955).
Appellants contend, however, that their association with Scarfo is within the ambit of the First Amendment freedom. They claim that their association was purely a social relationship, one that developed through their mothers. Gerace contends it is because of his mother's friendship with Kathryn Scarfo, and Lillian Gerace's maternal pressure, that he helped Scarfo make bail in 1979. Similarly, Materio claims he helped Scarfo make bail as a favor to his mother, Kathryn Scarfo, whom he knew for 25 years. It is also for this reason, the union officials *326 argue, that their phone numbers can be found on Scarfo's telephone list.
Assuming a purely social relationship existed between Scarfo and the union officials, the State maintains it is still unprotected by the First Amendment. Although Roberts has expanded the right of association to encompass both "expressional associations" and "certain intimate human relationships," that case has not raised to the level of First Amendment protection every social relationship which may exist in a society. Roberts, supra, 468 U.S. at ___, 104 S.Ct. at 3249, 82 L.Ed.2d at 471. The types of relationships which fall under the protected category include those that, "attend the creation and sustenance of a family, ... the raising and education of children ... and cohabitation with one's relatives...." 468 U.S. ___, 104 S.Ct. at 3250, 82 L.Ed.2d at 472.

B.
Assuming, arguendo, that the relationship of Gerace and Materio with Scarfo is constitutionally protected, any infringement resulting from their disqualification under Section 86 of the act may still be justified as a compelling State interest. As noted in Roberts, the First Amendment right of association is not absolute. "Infringement on that right may be justified by regulations adopted to serve compelling State interests unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." 468 U.S. at ___, 104 S.Ct. at 3252, 82 L.Ed.2d at 475.
Appellants concede that the State has a compelling interest in "keeping organized crime out of unions representing casino employees." The United States Supreme Court also recognized this interest in Brown v. Hotel and Restaurant Employees and Bartenders International Union Local 54, 468 U.S. ___, ___, 104 S.Ct. 3179, 3182, 82 L.Ed.2d 373, 379 (1984). Furthermore, it is the express policy of the Casino Control Act to *327 protect the industry from the influence of organized crime through labor unions. Report and Recommendation of Casino Gambling by the New Jersey State Commission of Investigation (April 1977) at 1-14; N.J.S.A. 5:12-1(b)(6)).
Appellants argue, however, that the Commission found no evidence of influence by Scarfo. They contend Section 86 sanctions should be applied only when the State demonstrates actual influence and impropriety, and not to prevent the possibility of influence at some future date.
In Boardwalk Regency, supra, this court reviewed the Commission's findings that Clifford and Stewart Perlman were unsuitable for licensure based, in part, upon their association with organized crime figures. 180 N.J. Super. 324 (App.Div. 1981). The Perlmans argued that they were disqualified for their "innocent associations" unrelated to the casino industry. 180 N.J. Super. at 339. In affirming their disqualifications, we stated:
The question was not then, and is not now, whether those transactions were lawful or how lawful, or ethical, or how ethical. The question which the Perlmans failed to see then and, perhaps understandably, do not now acknowledge, is: what of the impact of those transactions and associations upon the policies intended to be served by casino gaming regulation under legislative imprimatur? [180 N.J. Super. at 348].
The policies "intended to be served," include, the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations, as expressed in N.J.S.A. 5:12-1(b)(6), and the exclusion from participation in the casino industry of persons with known criminal records, habits, or associations, as found in N.J.S.A. 5:12-1(b)(7). Boardwalk Regency also held that there is nothing inherently wrong with sensitive and strict regulations which enable the Commission to control the industry better. 180 N.J. Super. at 341.
Here, the disqualifying conduct of Gerace and Materio closely parallels that engaged in by the Perlmans in Boardwalk Regency. Gerace and Materio personally associated themselves with an organized crime figure, Nicodemo Scarfo. The Commission *328 found they were responsible for the manifestations of Scarfo's influence in the union's business affairs. As in Boardwalk Regency, the operative question is not whether the associations between Gerace, Materio and Scarfo are lawful or ethical, but rather what impact such associations have on the policies intended to be served by casino gaming regulation. See 180 N.J. Super. at 340, 348. The State's interest in maintaining the integrity of casino operations supersedes appellants' right to freedom of association. It should also be noted, that the United States Supreme Court dismissed the Perlmans' constitutional arguments "for want of a substantial federal question." Perlman v. Attorney General, 459 U.S. 1081, 103 S.Ct. 562, 74 L.Ed.2d 927 (1982). The Commission has demonstrated the compelling State interest of protecting the casino industry. That interest justifies any associational infringement resulting from the disqualification of Gerace and Materio.

III.
Appellants contend that Section 86 of the Casino Control Act is unconstitutionally vague on its face and as applied to them. Specifically, appellants contend that the term "inimical" is impermissibly vague on its face, and that the statute is vague as applied because they were not given adequate notice that Scarfo was a "career offender" until the Commission's hearing in 1982.
A statute is void for vagueness if it is couched in terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." State v. Lashinsky, 81 N.J. 1, 17-18 (1979). As long as procedural and judicial safeguards are available, however, the fact that certain statutory phrases are not "impeccable specimens of draftsmanship" does not impugn their legality. In In re Boardwalk Regency Casino License Application, 180 N.J. Super. 324, 345 (App.Div. 1981), quoting In Review Health Care Adm. Bd. v. Finley, 168 N.J. Super. 152, 167 (App.Div. 1979), aff'd sub nom. *329 New Jersey Ass'n of Health Care Facilities v. Finley, 83 N.J. 67 (1980), app. dism. sub nom. Wayne Haven Nursing Home v. Finley, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980).
In Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court reviewed the values that are offended by vague laws and determined a twofold purpose in requiring specific legislation. The Court first insisted the drafters provide notice as to the conduct prescribed. Secondly, the Court mandated explicit standards for those who apply the statutes in order to avoid arbitrary and discriminatory enforcement. 408 U.S. at 108, 92 S.Ct. at 2298.
The degree of specificity, however, depends on the nature of the legislative provision in question. The most stringent judicial review has been reserved for those cases involving criminal statutes or penalties, or situations in which a law threatens to inhibit the exercise of constitutionally protected rights. See Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939); Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972). Regulation of economic activity, by contrast, is subject to a less strict vagueness test. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 369-370 (1982), reh. den. 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). The United States District Court recognized in Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Danzinger, 536 F. Supp. 317, 337 (D.N.J. 1982) that "the alleged vague portions of § 86 are aimed primarily at economic activity."
In addition, because Section 86(f) does not infringe on constitutionally protected freedoms, a facial vagueness attack can succeed only if it is shown that the statute is "invalid in toto  and therefore incapable of any valid application." Steffel v. Thompson, 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505, 523 (1974). Unless the statute is impermissibly vague in *330 all of its applications, it must be upheld against a facial vagueness attack. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. at 494-495, 102 S.Ct. at 1191-1192. A plaintiff who engages in some conduct that is clearly proscribed by the statute cannot complain of the vagueness of the law as applied to the conduct of others. We must examine the vagueness argument against Section 86(f) of the act in light of the facts of the case at hand. United States v. Mazurie, 419 U.S. 544, 551, 95 S.Ct. 710, 715, 42 L.Ed.2d 706, 713 (1975).
Appellants contend the term "inimical" does not give a person of ordinary intelligence adequate notice of what conduct is prohibited by the act. Appellants allege that since not all associations with career offenders are prohibited by the act, persons involved in the casino industry are required to speculate as to which associations are "inimical."
In considering the challenge to the "inimical" criterion, this court must view Section 86 as part of the overall casino regulatory scheme. As we stated in Boardwalk Regency "the words of a statute must not be considered to exist in a vacuum, without reference to relevant policy considerations as they are expressed in the whole act, or without regard for the words of balance of the statute." 180 N.J. Super. at 346.
N.J.S.A. 5:12-86(f) reads as follows:
The identification of the applicant or any person who is required to be qualified under this act as a condition of a casino license as a career offender or a member of a career offender cartel or an associate of a career offender or a career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations. For purposes of this section, career offender shall be defined as any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of this State. A career offender cartel shall be defined as any group of persons who operate together as career offenders.
The word "inimical" is not defined. As appellants note, on December 15, 1976, during the public hearings on the Commission Control Act, Atlantic City Commissioner Edmund Colanzi *331 questioned the use of the word "inimical" in the context of the act's disqualification provisions. Colanzi's criticisms were rejected. The State points out that the term "inimical" was interpreted by the Commission as early as 1979, in In Re Application of Resorts International Hotel, Inc., for a casino license, Docket No. 79-CL-1 (Casino Control Commission 1979). There the Commission stated, in part:
... [I]n considering an alleged association with a career offender, the Commission is concerned with more than the reflection, if any, which the association has on the character of the Applicant, or other person required to be qualified. Even assuming the good character of such a person, a continuing association with career offenders or other unsuitable persons might well be inimical to the Act or to legalized gaming where the nature and quality of the association would justly call into question the integrity of the regulatory process and of casino operations. Such a question would arise where the nature and quality of the relationship create a risk that the career offender might exercise some degree of influence or control over the association with regard to gaming operations or other business incidental to such operations. The danger of such indirect participation by career offenders or other unsuitable individuals cannot be tolerated. [Resorts at 17-19].
Courts have repeatedly upheld, as against vagueness challenges, criterion less definite than that challenged here. Our Supreme Court upheld the standards of "good moral character" and "professional or occupational misconduct" against challenges of unconstitutional vagueness. In re Polk License Revocation, 90 N.J. 550 (1982). In Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 339, 72 S.Ct. 329, 330, 96 L.Ed. 367, 370 (1952), the Court upheld a regulation which directed motor vehicle drivers transporting explosives or inflammable material to "avoid, so far as practicable, ... driving into or through congested thoroughfares...."
In addition, the Supreme Court upheld a statute making it a crime to sell goods at "unreasonably low prices for the purposes of destroying competition or eliminating a competitor." United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), reh. den., 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13 (1963). Finally, this court has upheld against a vagueness challenge, the "good character" *332 criterion of the casino control act. In re Boardwalk Regency Casino Application, supra, 180 N.J. Super. at 345-347. The disqualification standard of N.J.S.A. 5:12-86(f), as interpreted and refined by the Commission, is at least as definite and validly applicable to certain types of conduct as was the "good character" standard approved of in Boardwalk Regency and, accordingly, appellants' facial vagueness claim must fail.[6]
A statute is also unconstitutionally vague if the discretion of those who must enforce it is not limited by explicit legislative standards. Grayned v. City of Rockford, supra, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222. Appellants argue the "inimical" standard encourages an arbitrary application dependent solely on the "whim" of the Commission.
In Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940) the Court noted that in many cases a statute's application may be difficult to describe. In rejecting a vagueness challenge it stated:
The difficulty or impossibility of drawing a statutory line is one of the reasons for supplying merely a statutory guide ... that guide is sufficiently precise for an intelligent determination of the ultimate questions of facts by experts.... [310 U.S. at 399-400, 60 S.Ct. at 915-916].
Appellants also argue that Section 86 of the act is unconstitutionally vague as applied to them. Gerace and Materio contend they should have been apprised that Scarfo was a "career offender" prior to their disqualification. It was not until the *333 hearings before the Commission in 1982, they contend, that they had actual notice Scarfo would be considered a "career offender." They claim that because they were not notified by the Commission of Scarfo's status, they had no way of knowing that their conduct was "inimical" to the policies of the gaming industry.
During 1982, the Commission conducted extensive hearings which resulted in the disqualification of Gerace and Materio on the basis of their association with Scarfo. It is self-evident from the facts adduced that the union officials had close contact with Scarfo. Minimally, they had constructive knowledge of Scarfo's illegal activities. The press, furthermore, should have put appellants on notice that Scarfo was not a highly reputable citizen. In 1979, appellants contributed money to a bail fund for the release of Scarfo and his associates, following their arrest for a widely publicized homicide. Although Scarfo was never convicted of that crime, the incident should have warned appellants of Scarfo's possible exclusion from the gaming industry.
Appellants contend, however, they must have actual notice of Scarfo's classification as "a career offender" before they can be disqualified, relying on Boardwalk Regency, supra, for this proposition. In that case, the Perlmans were found to be disqualified due to their repeated relationship with a person of unsuitable character who associated with persons engaged in organized criminal activities. In concluding that the act was not vague as applied to the Perlmans, this court referred to the fact that the Perlmans had received notice from the Nevada Gaming Commission that their associations would be considered unacceptable. 180 N.J. Super. at 347. We also stated however, that the potential key employee was reasonably apprised by this statute, "as a matter of common knowledge, in light of ordinary human experience, as to the kind of conduct necessary to satisfy this statute (or put another way, the kind of conduct which is likely to result in disqualification)." 180 N.J. Super. at 347. In that light, Boardwalk Regency cannot be cited for the *334 proposition that appellants must receive actual notice from the Commission of Scarfo's status as a "career offender" before they can be disqualified. See In Re Boardwalk Regency License Application, 180 N.J. at 345-347.
Appellants also rely on the Commission's "black-listing" provision, N.J.S.A. 5:12-71, for the proposition that they should have been given notice. Section 71 provides that the Commission shall establish a list of persons who are to be excluded from licensed casinos because, in the opinion of the Commission, their presence would be inimical to the interest of the act. The list consists primarily of persons convicted of cheating at casino games and of notorious organized crime figures. Scarfo was placed on the list in 1983, after Gerace and Materio were found disqualified by the Commission. However, the Commission contends that the "exclusion list" is not comprehensive, and is not designed to notify the general public of the identity of career offenders. The incorporation of Section 71 into Section 86(f) is not warranted by the policy of the act and is not required by constitutional law. In addition, Gerace and Materio cannot seriously contend that they were unaware that Scarfo was a career offender until he was placed on the "exclusion list."
We conclude that Gerace and Materio were not entitled to be given formal notice that Scarfo was considered a "career offender" prior to the disqualification, and that Section 86(f) of the act is not vague on its face nor as applied to appellants.

IV.
Gerace claims that the Casino Control Commission denied him due process of law by failing to grant him either immunity or a stay of the proceedings. During the 1982 hearings before the Commission, the Division called Gerace as a witness. Gerace declined to testify on the ground that his answers might incriminate him. Gerace requested that the Commission grant him immunity or a stay of the proceedings until resolution of a *335 pending Grand Jury investigation. The Commission refused both requests. Gerace now argues that the Commission violated his constitutional right to due process.
On May 25, 1982, the Division petitioned the Commission to grant Gerace immunity for the deposition testimony pursuant to N.J.S.A. 5:12-67. However, the Division imposed two restrictions on the grant of immunity. First, the record would be sealed and remain so until further order by the Commission. Second, all parties and their counsel would be prohibited from disclosing the contents of the deposition. The Division claimed that sealing the transcript was necessary to protect other law enforcement agencies in their ongoing investigations. On May 26, 1982, the Commission granted the Attorney General's petition and incorporated the protective measures. Gerace was deposed by the Division on May 28, June 1, 2, and 3, 1982.
The Commission hearings began in June 1982. On July 14, 1982, the Division requested that the Commission partially unseal the deposition transcripts in order to review, in camera, portions of Gerace's testimony. Gerace's counsel never took a position on the Division's request. The Commission denied the request, stating that it would only accept testimony presented publicly, in compliance with the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq., N.J.S.A. 5:12-73(b). For the same reason, the Commission denied the Division's petition to have Gerace provide live testimony in camera.
On July 27, 1982, Frank Gerace was called as a witness and invoked his Fifth Amendment privilege in response to all substantive questions. The Division refused to request immunity for Gerace's testimony before the Commission, again due to the ongoing criminal investigations. Counsel for Gerace then requested a stay of all Commission proceedings until the Grand Jury investigations were concluded.
The authority of the Casino Control Commission to confer testimonial immunity upon a witness is established by N.J.S.A. 5:12-67, which provides in part:

*336 If, in the course of any investigation or hearing conducted under this act, a person refuses to answer a question or produce evidence on the ground that he will be exposed to criminal prosecution thereby, then in addition to any other remedies or sanctions provided for by this act, the commission may, by resolution of four of its members and after the written approval of the Attorney General, issue an order to answer or to produce evidence with immunity. (emphasis provided).
Determinations with regard to the grant of immunity, have been delegated to the sole discretion of the Attorney General. In re Tuso, 73 N.J. 575, 579 (1977).
Gerace first claims that the Division acted with "unclean hands" by seeking immunity for him in order to obtain his deposition. He claims that by refusing to seek immunity at the Commission's public hearings, the Division effectively prevented him from rebutting their testimony. Thus, the Division received the benefit of his testimony, without the disadvantage of enabling him to defend himself at the Commission's disqualification hearings.
The Division denies receiving any benefit from Gerace's deposition testimony. In United States v. Gerace, 576 F. Supp. 1185 (D.N.J. 1983), upon defendant Gerace's motion to dismiss the pending indictment[7] the federal court held that the government overcame its heavy burden of establishing that the investigation and upcoming trial of Gerace was in no way tainted, directly or indirectly, by his previous testimony given under a grant of immunity. The judge found that the proposed evidence was derived from legitimate sources independent of the immunized testimony. The Division contends that it was to protect the grand jury investigations that it sealed the deposition testimony. Although federal prosecution of Gerace would have been possible even after a public release of the immunized testimony, it would have placed a heavy burden on the prosecutor *337 to show the investigation was not tainted. See United States v. Smith, 580 F. Supp. 1418, 1425 (D.N.J. 1984). Gerace's accusation that the Division was only concerned with the future federal prosecution, therefore, must fail. We also note that Gerace never supported the Division's petition that the deposition be reviewed by the Commission in camera.
Gerace also argues that the lack of immunity rendered the Commission's proceedings one-sided. The record indicates, however, that 16 witnesses testified on behalf of Local 54 and its officers. Warren Borrish, for example, testified that Gerace's relationship with Scarfo was strictly social. Other witnesses testified that Gerace was an effective and honest labor representative. Gerace was thus able to introduce evidence on his behalf without personally testifying.
Gerace next argues that his failure to testify deprived the Commission of crucial evidence. Gerace claims that because there was no direct evidence of influence by Scarfo, the Commission was obligated to grant Gerace immunity in order to have a complete factual record. Gerace, however, ignores the mass of circumstantial evidence presented against him.
Neither state nor federal courts have recognized a due process right to immunity. In Ryan v. State of Montana, 580 F.2d 988 (9 Cir.1978) cert. den., 440 U.S. 977, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), for example, the Ninth Circuit determined the State was not required to grant a probationer immunity from use of testimony given at a combined probation-revocation and deferred sentencing hearing at a time when he was under criminal indictment for the same act. Ryan moved for a continuance of the revocation-sentencing proceeding until after his trial on the criminal charge. His motion was denied. Ryan subsequently argued on appeal that he had been denied due process by being forced to elect to remain silent at the sentencing hearing and risk revocation of his probation, or to speak in his own defense and risk incriminating himself on the criminal charge. 580 F.2d at 990. The Ninth Circuit observed that *338 Ryan's decision whether or not to testify was a strategic choice. 580 F.2d at 990. The court refused to find a constitutional right to immunity.
The right to remain silent cannot be infringed through any penalty for asserting that right. Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The infringement, however, must be a direct consequence of that assertion. Thus, a police officer may not be discharged from office for refusing to testify before a Grand Jury about the performance of his duties. Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). That is not the situation in this case. Gerace was disqualified solely on the evidence presented against him. Although the Commission could have drawn adverse inferences from Gerace's failure to testify without infringing upon his constitutional rights, it chose not to. Only a penalty directly drawn from the invocation of the right to remain silent is prohibited. See Duratron Corp. v. Republic Stuyvesant Corp. et al, 95 N.J. Super. 527 (App.Div. 1967), certif. den., 50 N.J. 404 (1967).
Similarly, Gerace had no constitutional right to a stay. Gerace requested a stay on July 27, 1982, after 15 days of testimony had been completed. In addition, the term of one of the Commissioners was due to expire on August 4, 1982. The Commission inquired as to when the Grand Jury investigation would end. Counsel for Gerace could not give a definite response.
Gerace's request for a stay was premised on the Grand Jury criminal investigation previously discussed. Gerace's request, however, was tenuous in that he stated he would testify without immunity, only if the Grand Jury did not return an indictment against him. The Commission held that it could not stay the hearings in light of the uncertainty as to the length of the Grand Jury proceedings, its results and the impending change in its composition.
The Commission's decision was supported by New Jersey and federal cases. In National Freight, Inc. v. Ostroff, 133 N.J. *339 Super. 554 (Law Div. 1975), the Superior Court denied defendant's motion for stay. Ostroff faced both criminal charges and a civil complaint based on the same factual scenario. In denying Ostroff's motion for stay of the civil suit until resolution of the criminal charges, the Law Division judge stated:
To say that the civil suit must remain in statu quo indefinitely is to import to the courts an impotency unworthy of them. To compel other parties to sit supinely by while their rights or possibility of recovery are eroded is to invite contempt for the law as well as to permit any guilty party to secrete or dissipate the fruits of his wrongdoing. [133 N.J. Super. at 559]
Similarly, in DeVita v. Sills, 422 F.2d 1172 (3 Cir.1970), the Third Circuit would not stay defendant's civil proceedings until resolution of his criminal charges. In DeVita, a New Jersey attorney and suspended County District Court judge, sought to restrain proceedings for disbarment and removal from judicial office because of a pending indictment arising out of the same alleged misconduct. The Court of Appeals held that, while plaintiff could not be deprived of his right to practice law as a direct consequence of an invocation of his right to remain silent, his alleged right to have the criminal charges resolved before the civil proceedings was without constitutional basis. 422 F.2d at 1177-1180.
Gerace's contention that he was deprived of due process is without merit. Appellant was merely forced to elect whether to defend himself against the Division's allegations or to remain silent. The Division was not constitutionally obligated to seek immunity, even though it had obtained Gerace's deposition testimony under a grant of immunity. Furthermore, the Commission was not obligated to grant a stay pending the resolution of the Grand Jury investigation. Gerace was merely put to the constitutionally acceptable choice of whether to testify or to remain silent.

V.
On August 6, 1984, the Division petitioned the Commission for a supplemental order which would directly prohibit Gerace, *340 Materio and LaSane from acting as officers, agents, or principal employees of Local 54. In response to the petition, both Local 54, and Gerace, Materio and LaSane, as individuals, raised issues concerning the appropriateness of additional sanctions. Appellants alleged that new evidence, not previously heard by the Commission, was now available which would establish that the Commission's original disqualification order of September 1982 was erroneous. Appellants further alleged that the new evidence, by way of testimony of Gerace and Materio, would establish that the Commission's findings of disqualification under Section 86(f) of the act were stale and moot. In addition, appellants contended that the Commission should reconsider the disqualification of LaSane.
On September 12, 1984, the Commission heard oral argument on the Division's petition for direct removal of Gerace, Materio and LaSane. At that time, appellants renewed their requests for a reopening of the record. The Commission denied appellants' request, ruling that the rehearing applications were not in compliance with the act. On September 24, 1984, Local 54, Gerace, Materio and LaSane filed new petitions with the Commission seeking a rehearing of its decision and supplemental order of September 12, 1984. The Commission denied appellants' requests on September 26, 1984. Appellants now challenge that decision. They allege the Commission abused its discretion by refusing to reopen the disqualification hearings.
Administrative agencies have the inherent power to reconsider and redetermine prior decisions in appropriate circumstances. In re Trantino Parole Application, 89 N.J. 347 (1982). Absent legislative restrictions, the agency's power to reopen and modify prior decisions is limited by considerations of fairness and reasonableness. 89 N.J. at 364.
N.J.S.A. 5:12-107(d) governs rehearings by the Commission. Section 107(d) provides, in pertinent part:
The commission may, upon a motion therefor made within ten days after the service of the decision and order, order a rehearing before the commission upon *341 such terms and conditions as may be just and proper. Such motion shall be granted only upon a finding that there is additional evidence which is material and necessary and which would be reasonably likely to change the decision of the commission, and that sufficient reason existed for failure to present such evidence at the hearing of the commission.
Thus, the Commission may, at its discretion, reopen the hearings once several procedural requirements have been met.
The first restriction in bringing a motion for rehearing is a ten day time limitation embodied within the act. Section 107(d) precludes the Commission from granting rehearings on motions not filed within ten days after the service of its order. N.J.S.A. 5:12-107(d). The policy behind a time limitation was best explained by the United States Supreme Court in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The Court, recognizing that a time gap exists between the closing of an administrative hearing and the rendering of a final decision (or judicial review), stated:
... If upon the coming down of the order litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. [435 U.S. at 554-555 [98 S.Ct. at 1217], quoting, ICC v. Jersey City, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420, 1428 (1944)]
The issue is whether appellants timely filed their motion for reconsideration. Appellants argue they are seeking a rehearing of the Commission's order of September 12, 1984. The State, on the other hand, contends it is the Commission's 1982 decision which disqualified appellants in the first instance, that they seek to reopen.
Gerace, Materio and LaSane contend that the Commission's 1982 disqualification order and its 1984 sanction order are interrelated. To conduct a rehearing of the 1984 order, the Commission must, by necessity, address the merits of the 1982 disqualification. In addition, they argue, the Commission's 1982 order directed sanctions against the Union. It was not until 1984 that the individual appellants were directly impacted. *342 If appellants' argument is accepted, their motion for reconsideration was timely in that it was filed on September 24, within ten days of service of the Commission's September 12, 1984 order.
The State claims that the Commission's order of September 1984 merely imposed new sanctions to enforce the disqualifications adjudicated in 1982. Appellants' motion, in that case, was filed two years late and was properly denied by the Commission. The State also argues that the statutory bar is not unjust in that appellants may seek early relief from their disqualifications pursuant to the Commission's reapplication regulations, N.J.A.C. 19:41-8.8.
We need not determine which order appellants are addressing in their motion for reconsideration. The pertinent issue here is whether the Commission abused its discretion in denying appellants' motion. The Commission denied the motion for rehearing by finding appellants failed to comply with all the requirements delineated in N.J.S.A. 5:12-107(d).
That section establishes four requirements for bringing a motion for rehearing. The moving party must show that: (1) there is additional evidence; (2) the evidence is material and necessary; (3) it would be reasonably likely to change the Commission's decision, and (4) there was sufficient reason for failing to present the evidence at the hearing. N.J.S.A. 5:12-107(d). The Commission has the discretion to grant a rehearing only upon a showing of the factors delineated above.
Gerace contends he satisfied all necessary statutory requirements for a rehearing. His rehearing petition was based entirely on his present willingness to testify before the Commission. He contends that he was unable to testify in 1982 because he was the subject of a grand jury investigation; also that his testimony is material and necessary and presents new evidence that would change the Commission's decision.
Gerace sought to open the record to testify before the Commission on the following matters: (1) his association with Scarfo since 1982; (2) his alleged business dealing with Scarfo's *343 associates; (3) his appointment to union posts of persons allegedly tied to Scarfo, and (4) Scarfo's alleged influence on Local 54. Gerace claims his testimony presents new evidence because he did not have the opportunity to testify before the Commission. He also claims that the evidence is material and necessary because it directly rebuts the Division's allegations that he was influenced by Scarfo in his business dealings. Gerace reminded the Commission that the Division elicited four days of deposition testimony from him, a further indication of the importance of his testimony. He also contends that his testimony would change the outcome of the disqualification hearings. Since three Commissioners have joined the Commission since the 1982 hearings, his testimony would enable them to judge his credibility for themselves. Gerace claims that his testimony would also demonstrate to the Commission that the feared "inevitable detrimental effect" has not materialized in the two years since the 1982 proceedings.
The Commission had determined at its September 26, 1984 hearing, that Gerace's representations were "vague and conclusory" and failed to demonstrate the materiality or necessity of his testimony. The Division noted that sixteen witnesses were produced on behalf of Local 54. Those witnesses testified that Scarfo's and Gerace's relationship was strictly a social one, and that Scarfo exercised no influence over Local 54. To the extent that Gerace's testimony would relate to pre-1982 events, it is merely cumulative or impeaching.
Any testimony relating to events after the 1982 hearing is irrelevant in addressing the Commission's original disqualification decision. Evidence relating to events which occurred between 1982 and 1984 is relevant in the context of a petition for reapplication pursuant to N.J.A.C. 19:41-8.8. That regulation precludes any natural person found disqualified from reapplying for licensure for five years from the date of the Commission's ruling. However, subpart (g) also provides, that any person barred for the five year period, may petition the Commission to permit reapplication at any time. N.J.A.C. 19:41-8.8(g). *344 Once the procedural criteria have been met, the Commission may grant early reapplication at its discretion. Appellants argue that because of the Commission's unfettered discretion, reapplication provides them with no effective remedy. The act, however, provides explicit guidelines regarding the timing and nature of rehearing applications. In the instance of Gerace's testimony concerning events which occurred after the disqualification hearings, the statutory guidelines have not been met.
The Commission also challenges Gerace's contention that the change in their composition warrants a rehearing. The Casino Control Commission is a continuing body. Gerace's contention that a rehearing is necessary so that the three new members can express their positions is without merit. To the contrary, the substantial change in the Commission's composition renders a rehearing inappropriate. If a rehearing is granted, only two Commissioners would be able to weigh the new evidence against the testimony taken at the 1982 hearings.
Finally, Gerace's explanation for his inability to testify before the Commission in 1982 does not meet the statutory requirement of "sufficient reason." N.J.S.A. 5:12-107(d). Gerace was the subject of a federal grand jury investigation at the time of the 1982 proceedings. His decision not to testify was a tactical choice. The Commission is not obligated to relieve him of the consequences of that choice because of a change of mind two years later. The Commission did not abuse its discretion in refusing to reopen the record to elicit Gerace's testimony.
The argument on behalf of Materio for a rehearing is more tenuous. Materio testified before the Commission during the 1982 disqualification hearings and, therefore, Gerace's fairness argument is inapplicable as to him. However, Materio now wishes to testify that: (1) he no longer performs work that is related to the Casino industry; and (2) he no longer associates with Scarfo in a manner that is "inimical" to the policies of the act.
*345 Materio claims that his testimony would dispel the Commission's fear of a "Scarfo effect." Although Materio's testimony would produce "additional" evidence not before the Commission at the 1982 hearings, it is inappropriate at this time. As in the case of Gerace, evidence regarding events which occurred after the disqualification hearing are relevant only for reapplication procedures, pursuant to N.J.A.C. 19:41-8.8.
Materio also wishes to offer proof that he no longer functions in any capacity involving the representation of casino employees. The Division argues that Materio's present non-participation in the casino industry does not rebut his disqualification. The Commission's orders could easily be evaded by changing or vacating positions, if that were the case. Furthermore, Materio did not resign his union offices until November 29, 1984. The Commission did not abuse its discretion by refusing to reopen the record to obtain Materio's testimony.
LaSane, like Materio, testified fully at the disqualification hearings. His rehearing petition is based on additional evidence regarding: (1) his exemplary conduct in office in the past two years; (2) the fact that his conviction is now more than ten years old, and (3) his union responsibilities are unrelated to employees licensed under the act.
LaSane's conduct since 1982 is not relevant to a rehearing. Action which occurred after his disqualification is relevant, if at all, to a petition for early reapplication, pursuant to N.J.A.C. 19:41-8.8. LaSane filed a reapplication petition with the Commission in November 1984 which was pending as of the date of this appeal.
In addition, a ten year old conviction does not automatically absolve one of disqualification. Conversely, N.J.S.A. 5:12-86(c)(4) provides that those whose convictions are more than ten years old have the opportunity to rebut the automatic disqualification procedures of section 86(c). LaSane was given *346 that opportunity in 1982. However, the Commission chose not to waive disqualification.
LaSane finally complains that he was unable to demonstrate to the Commission that his present employment with Local 54 is unrelated to the casino industry. LaSane's argument suffers the same fundamental defect as that advanced by Materio. LaSane, too, did not resign his union position until November 1984. The Commission was not required to consider testimony relating to his new responsibilities. We find no error.

VI.
On September 12, 1984, the Commission ordered Gerace, Materio and LaSane to cease acting as officers, agents or principal employees of Local 54. Appellants argue the Commission acted outside its statutory scope by imposing sanctions directly against the union officials.
In July 1984, the United States Supreme Court upheld Section 93(b) of the act against a challenge that the provision was preempted by federal labor law. See Brown v. Hotel and Restaurant Employees and Bartenders International Union Local 54, 468 U.S. ___, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). The Court held, however, that the Commission's sanctions could not interfere with the ability of Local 54 to act as an effective bargaining agent, and remanded the case to the District Court, for further findings consistent with its decision. 104 S.Ct. at 3196.
On August 6, 1984, the Division petitioned the Commission for a supplementary order. The Division specifically requested the removal from Local 54 of Gerace, Materio and LaSane. The Division cited Sections 64, 129(7) and 75 of the act to support its request.
The order issued by the Commission did not address itself in any way to Local 54, but aimed the sanctions directly against the disqualified union officials.
*347 Appellants contend the Commission was without the statutory authority to issue the September 12, 1984 order. In advancing their position, appellants advocate that a strict construction of Section 93 supports appellants' position. However, as the State argues, appellants' interpretation renders the Commission powerless in several circumstances. Thus, a broader reading of the statutes is mandated; one that encompasses the legislative intent.
The disqualification hearings before the Commission were brought in accordance with Section 93 of the act which provides, in pertinent part:
a. Each labor organization, union or affiliate, seeking to represent employees licensed under this act and employed by a casino hotel or casino licensed shall register ...
b. No labor organization, union or affiliate registered or required to be registered pursuant to this section and representing or seeking to represent employees licensed under this act may receive dues from any employee licensed under this act and employed by a casino licensee or its agent, or administer pension or welfare funds, if any officer, agent, or principal employee of the labor organization, union or affiliate is disqualified in accordance with the criteria contained in Section 86 of this act. The Commission may for the purposes of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require. (emphasis provided; N.J.S.A. 5:12-93)
The express language of Section 93 indicates it is the labor organization that must register under the act. In addition, it is the union against which the authorized sanctions are to be imposed. Conspicuously absent from the language of Section 93 is any indication that union officials are deemed "registrants" within the scope of Section 93, and are thus subject to individual sanctions.
Appellants argue that it is the express language of Sections 93(a) and (b) that is controlling. The language of that provision indicates that regulation of labor organizations and their officers was to be accomplished through the registration of the institution itself. If the Legislature had intended otherwise, appellants argue, it would have drafted the language of Sections *348 93(a) and (b) to permit sanctions directly against union officers and agents.
The State acknowledges that N.J.S.A. 5:12-93 does not explicitly empower the Commission to issue sanctions directly against union officers. The State contends, however, that the act delineates a procedure designed to indirectly coerce the removal of disqualified officials. Should this indirect coercion fail, the State argues, the Commission cannot be left powerless to protect the casino industry.
The express language of the act must be read in light of the legislative intent which was incorporated into the act itself in N.J.S.A. 5:12-1. It provides that it is the policy of this State to regulate and control all aspects of the casino industry. This policy was further expressed by our Supreme Court in Knight v. Margate, 86 N.J. 374 (1981), where the Court held:
... because casino operations "are especially sensitive and in need of public control and supervision," the statute dictates that "the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid the entry" into casino operations, directly or indirectly, of persons whose economic or occupational pursuits are violative of the "criminal or civil policies of this State." [86 N.J. at 382, quoting, N.J.S.A. 5:12-1(b)(9); emphasis added]
Appellants argue that Section 93 of the act imposes sanctions that are penal in nature, and therefore, the expansive view of that provision, as advocated by the State, must fail. They claim that the Commission forced the removal from office, under threat of contempt, of union officials who were otherwise legally pursuing their livelihood. The Commission's order merely substituted another sanction for that expressly called for by the act and, thus, the penal nature of Section 93(b), and the Commission's action has not changed. Given the penal nature of the applicable provisions, appellants argue, Section 93 must be strictly construed. State v. Grant, 196 N.J. Super. 470, 480 (App.Div. 1984).
Most of the provisions of the act are regulatory rather than penal in nature. The State argues that those provisions applied by the Commission, Sections 64, 129(7) and 75, are regulatory. *349 In addition, assuming arguendo that Section 93 sanctions can be penal, they are not as applied in this case. The cases cited by appellants on their behalf involve individuals who were deprived of their livelihoods by the suspension of their license. See New Jersey State Board of Optometrists v. Nemitz, 21 N.J. Super. 18 (App.Div. 1952). Here appellants may work as union officials in this State as long as they are not affiliated with the casino industry.
In its petition for supplemental sanctions, the Division cited several other sections of the act which govern the Commission's authority. Section 64, which regulates the Commission's powers and sanctions, provides in pertinent part:
The commission shall assure that licenses, certificates, or permits shall not be issued to nor held by, nor shall there be any material involvement, directly or indirectly, with the licensed casino operation or the ownership thereof by, unqualified or disqualified persons or unsuitable persons, or persons whose operations are conducted in a manner not conforming with the provisions of this act. For the purposes of this section, "unqualified person," "disqualified person," or "unsuitable person" shall mean any person who is found by the commission to be disqualified pursuant to the criteria set forth in section 86 c., e., f., g., and h., or to lack the financial responsibility and capability specified in the provisions of section 84. In enforcing the provisions of this act, the commission shall have the power and authority to deny any application; limit or restrict any registration, certificate, permit or approval; suspend or revoke any license, registration, certificate, permit or approval; and, impose a penalty on any person licensed, registered, or previously approved for any cause deemed reasonable by the commission pursuant to rules and regulations promulgated thereby.... (emphasis added; N.J.S.A. 5:12-64).
This provision confers broad powers on the Commission to take actions against "disqualified persons." Liberally construed in light of the legislative intent, the Commission's powers under Section 64 to impose sanctions directly against the three officials is evident. The Commission's authority to take actions directly against union officials is also sanctioned by a strict construction of the provision. The expressed purpose of Section 64 is to exclude "disqualified" persons from direct or indirect involvement in casino operations. Local 54, and its officers, are "materially involved" in the daily activities of the casino industry through the employment, management and *350 discipline of casino hotel employees. In addition, the union officials "registered," pursuant to N.J.S.A. 5:12-40 and 41. A "registration," as provided by this act, is "any requirement other than one which requires a license as a prerequisite to conduct a particular business as specified by this act." N.J.S.A. 5:12-40. Thus, even given a strict construction, the Commission was empowered to disqualify Gerace, Materio and LaSane pursuant to Section 64.
In addition, the Commission was empowered to issue a "cease and desist" order against the union officials pursuant to N.J.S.A. 5:12-129, which states, in pertinent part:
In addition to any penalty, fine or term of imprisonment authorized by law, the commission shall, after appropriate hearings and factual determinations, have the authority to impose the following sanctions upon any person licensed or registered pursuant to this act:
(7) Enter a cease and desist order.... [N.J.S.A. 5:12-129]
As previously mentioned, appellants are "registered" pursuant to N.J.S.A. 5:12-40.
The final provision cited by the Division in its petition, N.J.S.A. 5:12-75, dispels any doubt as to the propriety of the Commission's order. N.J.S.A. 5:12-75 states:
The commission may exercise any proper power or authority necessary to perform the duties assigned to it by law, and no specific enumeration of powers in this act shall read to limit the authority of the commission to administer this act. (emphasis provided)
This provision emphasizes the clear authority of the Commission to take any steps necessary and proper in its enforcement of this act. Read in conjunction with the legislative intent embodied in the act, N.J.S.A. 5:12-1, we conclude that the Commission properly issued direct sanctions against Gerace, Materio and LaSane.
The Commission's findings that Gerace and Materio associated with career offenders are supported by the evidence. The continual participation of Gerace and Materio in the casino industry creates an unacceptable risk of corruption. In light of the State's compelling interest in protecting the gaming operations, an infringement on appellants' First Amendment right of *351 association is warranted. In addition, the Commission did not deny Gerace due process by failing to grant him a stay or immunity in 1982, or by failing to reopen the record for a rehearing in 1984.
The decision of the Casino Control Commission is affirmed.
NOTES
[1] The Commission refused to impose Section 93 sanctions against Eli Kirkland.
[2] The Commission chose not to apply those Section 93 sanctions which would have prohibited the Union from administering pension and welfare funds.
[3] Appellants now concede that Scarfo is a career offender.
[4] All references to "the State" refer to both respondents, The Division of Gaming Enforcement and the Casino Control Commission, unless otherwise specified.
[5] Appellants include in their argument the results of a polygraph examination taken by Materio after the 1982 hearings. The test results, however, were never before the Commission and, thus, not a part of the record. This court denied respondent's motion to strike portions of appellants' brief and appendix that were not part of the record below.
[6] The vagueness challenge to the term "inimical" was rejected by the United States District Court in Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Danzinger, 536 F. Supp. 317 (1982). Judge Brotman found that the allegedly vague portions of Section 86 of the act were aimed primarily at economic activities, and that the penalties which the act imposes are civil rather than criminal. He also found that Section 86(f) does not address all associations with career offenders, but only those which would defeat the statutory purposes of the act. 536 F. Supp. at 337. In addition, he found that the "reasonable belief" restriction on the Commission's ability to disqualify applicants established an objective standard for judging an individual's action, and concluded that appellants herein were not likely to succeed on the merits of their vagueness claim. 536 F. Supp. at 337-338.
[7] The indictment alleged Gerace embezzled money in connection with the renovation work done by Toro Construction Company on Local 54's headquarters. Counsel had stipulated that defendant's previous immunized deposition testimony covered matters which were the subject of this prosecution.