# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sonic Services, Inc.,            :
                Petitioner     :
                                :
        v.                    :    No. 1698 C.D. 2018
                                :    Argued: September 10, 2019
Pennsylvania Gaming Control Board,   :
               Respondent    :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION BY JUDGE BROBSON**       **FILED: October 9, 2019**

Petitioner Sonic Services, Inc. (Sonic Services) petitions for review of an adjudication by the Pennsylvania Gaming Control Board (Board) dated November 28, 2018, revoking Sonic Services' Gaming Service Provider[1] Registration (Registration). For the reasons that follow, we affirm.

---

[1] Section 1103 of the Pennsylvania Race Horse Development and Gaming Act (Act), 4 Pa. C.S. § 1103, defines a "Gaming service provider" as follows:

**"Gaming service provider."** A person that is not required to be licensed as a manufacturer, supplier, management company or gaming junket enterprise under this part and:

(1) provides goods or services, including, but not limited to, count room equipment, to a slot machine licensee or an applicant for a slot machine license for use in the operation of a licensed facility; and

(2) provides goods or services to a slot machine licensee or an applicant for a slot machine license that requires access to the gaming floor or a gaming-related restricted area of a licensed facility.

## I.    BACKGROUND

Michael Giammarino (Giammarino) formed Sonic Services in 1988, and he is the corporation's sole owner.  (Reproduced Record (R.R.) at 787.)[2]  On August 10, 2016, the Board approved Sonic Services as a Registered Gaming Service Provider, thereby permitting Sonic Services to provide restaurant-related services to an affiliate of Parx Casino (Parx).  (R.R. at 785.)  Months after the Board made this approval, the Board's Bureau of Investigations and Enforcement (BIE) received information alleging that Sonic Services and/or Giammarino had ties to organized crime.  (*Id*.)  BIE investigated the veracity of the claims for a year, after which the Board's Office of Enforcement Counsel (OEC) filed an enforcement action seeking to revoke Sonic Services' Registration.  (*Id*.)  According to the enforcement action, BIE's investigation revealed that Sonic Services, through Giammarino, had associations with members of organized crime and, therefore, is not a suitable party for a registration pursuant to Section 1202(b)(23) of the Act, 4 Pa. C.S. § 1202(b)(23), and Sections 421a.1(h)-(i) and 421a.2(a)(4) of the Board's regulations, 58 Pa. Code §§ 421a.1(h)-(i) and 421a.2(a)(4).[3]  (*Id*. at 7-8.)

---

[2] The reproduced record in this matter follows a numbering format of "RR 1, RR 2," etc., and is not in compliance with Pennsylvania Rule of Appellate Procedure 2173, which directs the pages of the reproduced record to be numbered using Arabic numerals followed by a lower case letter "a"—*i.e.*, "1a, 2a, 3a," etc.  When citing to the page numbers of the reproduced record herein, we shall omit the "RR" preceding the page number.

[3] Sections 421a.1(h) and (i) of the Board's regulations provide:

(h) An applicant shall at all times have the burden of proof.  It shall be the applicant's affirmative responsibility to establish the facts supporting its suitability under the act and this part by clear and convincing evidence, including why a license, permit, certification, registration or authorization should be issued or renewed by the Board.

2

The Board's Office of Hearings and Appeals (OHA) conducted a hearing on this matter on May 15, 2018, after which Hearing Officer Jay Lantzy issued a Report and Recommendation (Recommended Report), concluding that OEC "failed to prove by a preponderance of the evidence that Giammarino's associations make Sonic Services unsuitable for a [r]egistration." (*Id*. at 697.) OEC filed exceptions to the Hearing Officer's Recommended Report, arguing that the evidence OEC presented clearly established that Giammarino's associations made Sonic Services unsuitable for a registration. (*Id*. at 786.) On October 31, 2018, at a public meeting before the Board, the Board permitted Sonic Services and OEC to present briefly their oral arguments concerning this matter. (*Id*. at 787.) During a public meeting on November 28, 2018, the Board voted to grant the relief requested in OEC's enforcement action and revoke Sonic Services' Registration. (*Id*. at 784.) On December 7, 2018, the Board issued findings of fact and conclusions of law in support of its adjudication. (*Id*. at 785-805.)

---

(i) A person holding a license, permit, certification, registration or authorization issued by the Board shall have a continuing duty to maintain suitability and eligibility in accordance with the act and this part.

58 Pa. Code §§ 421a.1(h)-(i).

Section 421a.2(a)(4) of the Board's regulation provides:

(a) An application for issuance or renewal of a license, permit, certification, registration or authorization may be denied, or a license, permit, certification, registration or authorization may be suspended or revoked if:

. . . .

(4) The applicant for or holder of a license, permit, certification, registration or authorization has misrepresented, falsified or omitted a fact in the application for licensure or renewal.

58 Pa. Code § 421a.2(a)(4).

3

The Board's relevant findings of fact reveal that in 1996, Giammarino's mother and Giammarino's stepfather, John Brescio (Brescio), reopened Lombardi's, a historic pizzeria located in the Little Italy section of New York City. (*Id.* at 787-88.) Lombardi's is owned by the corporate entity Pizza of 32 Spring Street, Inc. (*Id.* at 788.) Giammarino's mother was the sole shareholder of Pizza of 32 Spring Street, Inc. until her death. (*Id.*) Brescio is a reputed captain in the Genovese crime family with at least seven criminal convictions prior to 1986. (*Id.*) In making that finding, the Board relied, in part, upon testimony from an investigator for the Waterfront Commission of New York Harbor that Brescio was, and continues to be, affiliated with organized crime. (*Id.*) From 1988 to 1998, Sonic Services only sold and installed security, intercom, telephone, and music systems. (*Id.* at 787.) In 1998, Giammarino transitioned Sonic Services away from selling and installing technological systems and into the restaurant industry by opening a second Lombardi's location in Philadelphia. (*Id.* at 788.) In 2004, Giammarino closed the Lombardi's in Philadelphia and began managing the New York location. (*Id.*)

In 2011, Giammarino's mother died intestate, leaving ownership in Pizza of 32 Spring Street, Inc. to Brescio. (*Id.* at 789.) The next year, Brescio transferred his ownership of Pizza of 32 Spring Street, Inc. to JBJV Trust (Trust), which is now the sole shareholder of Pizza of 32 Spring Street, Inc. (*Id.*) In forming the trust, Brescio named Giammarino as the sole beneficiary. (*Id.*) Brescio retained the power to appoint additional beneficiaries and replace the trust protector, who, under the terms of the Trust, may replace the trustee and veto investment decisions. (*Id.*) Furthermore, the trustee must obtain approval from the trust protector for investments larger than $15,000. (*Id.*) Peter Cordua, who has served as Giammarino's accountant and as the accountant for Pizza of 32 Spring Street, Inc.,

4

is the sole trustee for the Trust. (*Id.*) Giammarino also serves as the President of Pizza of 32 Spring Street, Inc. (*Id.*) After transferring his ownership interest in Pizza of 32 Spring Street, Inc., Brescio represented to the media that he owned Lombardi's. (*Id.*) Lombardi's employees also named Brescio as the owner of Lombardi's in a lawsuit against the pizzeria in 2006. (*Id.*)

In 2014, Parx officials became interested in adding new dining options to their casino and met with Joseph DeSimone (DeSimone), a frequent customer at the casino, to discuss DeSimone's contacts in New York City's restaurant industry. (*Id.* at 790.) Unbeknownst to Parx officials at the time, DeSimone had multiple criminal convictions, was a reputed member of the Bruno/Scarfo crime family, and went by the street name "Joe Fudge." (*Id.*) Paul Greco, the General Manager of Parx, introduced DeSimone to the other Parx officials. (*Id.*) DeSimone later introduced the Parx officials to John DeLutro (DeLutro), who owned Caffé Palermo, a pastry shop in the Little Italy section of New York City. (*Id.*) Weeks later, the Parx officials travelled to Caffé Palermo to meet with DeLutro. (*Id.*) After the meeting, DeLutro took the officials to Lombardi's where Brescio gave the officials a tour of the restaurant and served them pizzas. (*Id.*) Based on the success of the meetings, the Parx officials decided to offer Caffé Palermo and Lombardi's the opportunity to set up establishments at the casino. (*Id.*) Chief Executive Officer for Parx, Anthony Ricci (Ricci), contacted DeLutro to express interest in having Caffé Palermo and Lombardi's on site at Parx's casino. (*Id.*) DeLutro expressed Ricci's interest to Giammarino, who managed the Lombardi's in New York City, and Giammarino expressed that he had no interest in having a close business relationship with DeLutro. (*Id.* at 791.) DeLutro and Giammarino were acquainted with each other since they operated businesses near to each other in Little Italy, but, according

5

to Giammarino, the two men only had approximately six interactions with each other throughout their years of acquaintance. (*Id.*) Parx soon after discovered that DeLutro had two drug-related criminal convictions, was a reputed member of the Gambino crime family, and was known by his street name "Baby John." (*Id.*) After learning of DeLutro's criminal history, Parx no longer had interest in any business dealings with DeLutro or Caffé Palermo. (*Id.*)

DeSimone and Giammarino met, apparently for the first time, in 2015. (*Id.* at 792.) At that time, DeSimone informed Giammarino that the Parx officials were still interested in having Lombardi's at their casino and offered to set up a meeting between Giammarino and the officials. (*Id.*) At that time, Giammarino operated three pizzerias: two Gennaro's Tomato Pie locations in Philadelphia and Lombardi's in New York City. (*Id.*) That same year—in 2015—DeSimone introduced Giammarino to Parx's General Manager, Paul Greco, after which Giammarino and Parx entered into business negotiations in order to place a Lombardi's location at the casino. (*Id.*) During the negotiations, Giammarino expressed that DeSimone would not be his business partner in the enterprise but that he would pay DeSimone a finder's fee. (*Id.*) On April 28, 2016, Sonic Services contracted with Parx to assist in establishing a pizzeria at the casino. (*Id.*) According to the agreement, Parx staff would run the pizzeria and Sonic Services, through Giammarino, would aid in design, management, recipes, recruitment, and other related services. (*Id.*) Subsequently, on February 1, 2017, Pizza of 32 Spring Street, Inc. entered into a consulting and marketing agreement with Brescio's entity, F&J Solutions. (*Id.*)

On December 21, 2017, after BIE received information concerning Giammarino's alleged ties to organized crime and after conducting a year-long

6

investigation into those claims, OEC filed its enforcement action. (*Id*. at 794.) As a result of OEC's filing, Parx officials evicted DeSimone from its establishment, terminated its agreement with Sonic Services, paid to Sonic Services $155,000 for, *inter alia*, services rendered, and returned all artwork or images related to Lombardi's that Sonic Services had loaned to Parx pursuant to its agreement with Sonic Services. (*Id*.) On February 20, 2018, Giammarino, through Pizza of 32 Spring Street, Inc., terminated the consulting and marketing agreement with Brescio's entity, F&J Solutions. (*Id*.) The next month, on March 13, 2018, Brescio irrevocably relinquished all retained rights related to the Trust. (*Id*.)

On May 25, 2018, at the hearing before the Hearing Officer, Giammarino testified that his interactions with Brescio, his stepfather, have been very limited since his mother's death. (*Id*. at 793.) Brescio also had no role in managing Lombardi's since Giammarino took over managing the pizzeria in 2004. (*Id*.) When asked why Brescio would hold himself out to be the owner of Lombardi's, Giammarino stated: "I mean, my wife says she's the owner of my business. My son says the same thing. I said the same thing about [the] New York [location] even before I was in this position. We're a family. I mean, people – you know, people – you're proud. You brag." (*Id*.) Giammarino later admitted that he allowed Brescio to "handle the media" for Lombardi's. (*Id*.) Brescio, however, had no part in the agreement between Sonic Services and Parx. (*Id*.) Thereafter, at the October 31, 2018 public meeting before the Board, Giammarino opted to address the Board personally instead of permitting his counsel to present oral argument. (*Id*.) In doing so, Giammarino stated, in relevant part:

> ii. "In 2004, my mother wanted to retire and my stepfather . . . at the time was having some trouble with his heart and they asked me to take the place over."

7

iii. "I took the place over and the only thing that I let [Brescio] . . . continue to do was handle media which is something he did during the whole time that he was there."

iv. "In 2011, my mother passed away, I then became President of [Pizza of 32 Spring Street, Inc.] and I continued with that same relationship with him . . . in a more of like a part-time few hours a month type relationship."

. . . .

vi. "He had no managerial duties, nothing at all. It was just these-these media appearances because that was what he was doing over the years."

. . . .

ii. "I don't socialize with the guy. I don't have any business dealings with him, all I do is go to work and I run the business."

. . . .

iv. "[The association with m]y stepfather was the only one that's problematic."

(*Id*. at 795-96.) Based on the findings of fact, the Board concluded that the OEC met its burden to prove that Sonic Services' associations, through Giammarino, compromise the public's confidence in the integrity of gaming in this Commonwealth. (*Id*. at 805.) Sonic Services then filed the instant petition with this Court.

## II. ISSUES

On appeal,[4] Sonic Services argues that the Board committed an error of law in concluding that Sonic Services, through Giammarino, is unsuitable for a

---

[4] This Court's scope of review of an agency's adjudication is limited to determining whether the agency committed an error of law or violated any constitutional rights, and whether any necessary factual findings are not supported by substantial evidence. 2 Pa. C.S. § 704; *Rubino*

8

registration because: (1) there is a lack of substantial evidence to support a finding that Giammarino had associations with DeSimone, DeLutro, and Brescio; (2) the Board committed an error of law in failing to consider Giammarino's disassociation with Brescio as evidence that the two men were no longer associates;[5] and (3) in the alternative, if there is substantial evidence to support such a finding as it relates to Brescio, the Board committed an error of law in concluding that Giammarino's association with Brescio would undermine the public's trust in the integrity of the gaming system.

## III. DISCUSSION

### A. Associations with DeSimone, DeLutro, and Brescio

Sonic Services first argues that there is a lack of substantial evidence to support the finding that Giammarino had associations with DeSimone, DeLutro, and Brescio. The Board, on the other hand, maintains that there is substantial evidence to support the finding.

Section 1202(b)(23) of the Act prohibits the Board from approving or renewing, *inter alia*, registrations unless the following requirements are satisfied:

> [T]he applicant has demonstrated by clear and convincing evidence that the applicant is a person of good character, honesty and integrity and is a person whose prior activities, criminal record, if any, reputation, habits and *associations do not pose a threat to the public interest or the effective regulation and control* of slot machine operations, table game operations, interactive gaming operations, casino simulcasting or sports wagering, *or create or enhance the danger of unsuitable, unfair or illegal practices, methods and activities* in the conduct of

---

*v. Pa. Gaming Control Bd.*, 1 A.3d 976, 980 n.7 (Pa. Cmwlth. 2010), *appeal denied*, 16 A.3d 504 (Pa. 2011).

[5] Though Sonic Services' second argument does not appear separately in its brief, we will treat it as such for purposes of our analysis.

> slot machine operations, table game operations, interactive gaming operations, casino simulcasting or sports wagering or the carrying on of the business and financial arrangements incidental thereto.

(Emphasis added.) The Act[6] does not provide a definition of the terms "association" or "associate." As this Court explained in *Hankin v. Upper Moreland Township*, 503 A.2d 109, 111 (Pa. Cmwlth. 1986), "[w]here the statute . . . does not specifically define the term sought to be construed, and the words are ones in common usage, they are to be given their common usage meaning." Webster's Third New International Dictionary defines "associate" as, *inter alia*, "to join often in a loose relationship as a partner, fellow worker, colleague, friend, companion, or ally[;] . . . to keep company with[;] . . . closely connected, joined, or united with another[;] . . . one who is frequently in company with another." Webster's Third New International Dictionary 132 (1993). According to Black's Law Dictionary, an "associate" is a "colleague or companion." Black's Law Dictionary 140 (9th ed. 2009). The term "association" on the other hand, seems to indicate a sort of union or organization of individuals. *See* Webster's Third New International Dictionary 132 (1993) ("the act or action of associating[;] . . . an organization of persons having a common interest"); Black's Law Dictionary 141 (9th ed. 2009) ("[a] gathering of people for a common purpose").

### 1. *DeSimone*

According to the Board's findings of fact, Giammarino testified that he first met DeSimone at the meeting in which DeSimone indicated that Parx officials were still interested, after deciding not to pursue business with DeLutro, in having a Lombardi's pizzeria in Parx's casino. (R.R. at 791-92.) Giammarino also indicated

---

[6] 4 Pa. C.S. §§ 1101-1904.

10

that he would pay DeSimone a finder's fee for initiating the business relationship between Parx and Sonic Services. (*Id.* at 792.) The record does not indicate that Giammarino and DeSimone had any other encounters outside of DeSimone seeking out Giammarino to introduce him to the Parx officials. Due to the tenuous connection between Giammarino and DeSimone, evidenced by the sole meeting and sole promise between the two men, there is a lack of substantial evidence to support the Board's finding that DeSimone is Giammarino's associate for purposes of the Act.

## 2. *DeLutro*

With respect to Giammarino's connection to DeLutro, the Board's findings of fact explain that Giammarino described his relationship with DeLutro as an acquaintanceship. (R.R. at 791.) Giammarino also testified that he and DeLutro had approximately six interactions over a number of years because each owned establishments in the Little Italy section of New York City. (*Id*.) Further, Giammarino expressly refused to enter into a close business relationship with DeLutro when Parx expressed interest in having Caffé Palermo and Lombardi's locations at Parx's casino. (*Id*.) Given the findings that Giammarino had no desire to be in the proposed business relationship with DeLutro and that the two men had very few interactions over the many years the two men operated businesses in the same vicinity, we conclude that there is a lack of substantial evidence to support the Board's finding that DeLutro and Giammarino are associated for purposes of the Act.

## 3. *Brescio*

Brescio's relationship with Giammarino, on the other hand, seems to present layers of business and personal connections between the two men. Brescio is Giammarino's stepfather. (R.R. at 787.) After Giammarino's mother died,

11

Brescio created the Trust, made Giammarino the sole beneficiary, and transferred all of his interest in Pizza of 32 Spring Street, Inc. into the Trust. (*Id.* at 789.) In forming this Trust, Brescio retained the power to appoint other beneficiaries and replace trust protectors, the latter of which have the authority to veto investment decisions and approve or deny investments greater than $15,000. (*Id.*) While Giammarino served as President of Pizza of 32 Spring Street, Inc., the entity entered into a consulting and marketing agreement with F&J Solutions, an entity owned by Brescio. (*Id.* at 792.) Despite Sonic Services' disavowal of any close connection between Giammarino and Brescio, given the extent of power Brescio maintained over the Trust, the hand Brescio still had in the media relations of Lombardi's, and the familial tie, the two men were, at the very least, "join[ed] . . . in a loose relationship as [] . . . colleague[s]." Webster's Third New International Dictionary 132 (1993). Accordingly, there is substantial evidence to support the Board's finding that Giammarino and Brescio were associates at least at all times relevant to the investigation.

We, therefore, conclude that of the three possible associates—*i.e.*, DeSimone, DeLutro, and Brescio—substantial evidence exists to support only the finding that Sonic Services, through Giammarino, was associated with Brescio for purposes of the Act. Given this conclusion, we now turn to a discussion of whether this association "pose[s] a threat to public interest or the effective regulation and control of" *or* "create[s] or enhance[s] the danger of unsuitable, unfair or illegal practices, methods and activities" in the gaming industry in this Commonwealth. 4 Pa. C.S. § 1202(b)(23).

## B. Effect of Giammarino's Disassociation with Brescio

Sonic Services argues that the Board, when determining whether Giammarino and Brescio were "associates" for purposes of the Act, committed an

12

error of law in failing to consider Giammarino's act of disassociating himself from Brescio after notice of OEC's enforcement action against Sonic Services. In response, the Board contends that Giammarino's act of disassociating with Brescio is immaterial to a determination of whether the two men were associates. We agree with the Board's contention.

Sonic Services points to Section 1312 of the Act, 4 Pa. C.S. § 1312, to support its argument. Section 1312 of the Act provides, in relevant part:

> *In the event that any slot machine license application is not approved by the board based on a finding that an individual who is a principal or has an interest in the person applying for the license does not meet the character requirements of* [S]*ection 1310* (relating to slot machine license application character requirements) or any of the eligibility requirements under this part, *or a person who purchases a controlling interest in a licensed gaming entity* in violation of [S]ection 1328 (relating to change in ownership or control of slot machine licensee), *the board may afford the individual the opportunity to completely divest his interest in the person*, its affiliate, intermediary, subsidiary or holding company seeking the license and, after such divestiture, *reconsider the person's or applicant's suitability for licensure* in an expedited proceeding and may, after such proceeding, issue the person or applicant a slot machine license. *The board shall approve the terms and conditions of any divestiture under this section.* Under no circumstances shall any divestiture be approved by the board if the compensation for the divested interest exceeds the cost of the interest.

(Emphasis added.)

Based on our reading of this particular statutory section, the divestiture procedure described above is quite unlike the situation presented in this matter. First, Section 1312 of the Act pertains to persons applying for a slot machine license or persons who purchase a controlling interest in a licensed gaming entity in

13

violation of Section 1328 of the Act, 4 Pa. C.S. § 1328. As to those persons, Section 1312 of the Act authorizes the Board to exercise the discretionary power to permit individuals who fail to meet the character or eligibility requirements to divest their interest in the person applying for or holding the license at issue, subject to Board approval. Here, Sonic Services is a registered Gaming Service Provider. Thus, Section 1312 of the Act is inapplicable. Further, we find no statutory provision in the Act that mandates or gives discretion to the Board to consider divestiture in revoking a registration upon concluding that a registrant's association renders the registrant unsuitable to retain its registration. Consequently, the Board did not commit an error of law in refusing to consider Giammarino's and Brescio's disassociation when determining whether the two men were associated.

## C. Effect of Association on Public Trust in the Integrity of Gaming

In the alternative, Sonic Services argues that if there is substantial evidence to support a finding that Brescio was Giammarino's associate, the Board committed an error of law in concluding that Giammarino's association with Brescio would undermine the public's trust in the integrity of gaming. Specifically, Sonic Services argues that the association with Brescio would not undermine the public's trust in the integrity of gaming because (1) neither Sonic Services nor Giammarino were involved in Parx's gaming operations; (2) Brescio had no control or influence over Sonic Services; and (3) Giammarino had no actual knowledge of Brescio's reputed ties to organized crime. The Board contends that Sonic Services' involvement in the gaming industry, because of Giammarino's association with Brescio, would cause the public to lose trust in the integrity of gaming in this Commonwealth.

Our research has revealed that no court in this Commonwealth has issued an opinion addressing this issue. New Jersey's Appellate Court, in *In re Hotel*

14

*and Restaurant Employees and Bartenders International Union Local 54*, 496 A.2d 1111 (N.J. Super. App. Div. 1985) (*International Union Local 54*), *cert. denied*, 475 U.S. 1085 (1986), has considered whether applicants for casino-related registration were unsuitable for licensure due to associations with individuals reputedly connected with organized crime.  We find the discussion in this case persuasive.

In *International Union Local 54*, the court addressed the question of whether certain members of a union associated with the casino industry in New Jersey were suitable for continued registration under the state's Casino Control Act.[7] *Int'l Union Local 54*, 496 A.2d at 1116.  New Jersey's Casino Control Act mandates that applicants who are "associate[s] of a career offender or a career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of [the Casino Control Act]" be denied licensure.  N.J. Stat. 5:12-86(f).  The court concluded that, in relevant part:  (1) New Jersey's Casino Control Commission correctly found that two union officers were associated with career offenders, at least one of whom was a member of organized crime; and (2) such associations created an "unacceptable risk of corruption."  *Int'l Union Local 54*, 496 A.2d at 1140.

In coming to its conclusion, the court discussed the policies that the Casino Control Act intends to serve and explained that "public confidence and trust in the credibility and integrity of the regulatory process of casino operations . . . and the exclusion from participation in the casino industry of persons with known criminal records . . . or associations" are two such policies.  *Id.* at 1127.  Further, the main query in determining the effect of the offending association on the public's

---

[7] N.J. Stat. §§ 5:12-1 to -233.

15

trust is not whether the association is "lawful or ethical, but rather what impact such associations have on the policies intended to be served by casino gaming regulation." *Id*. Based on the fact that the two union officers had these offending associations, the court determined that the union officers' continued participation in the casino industry created a risk that the industry would be corrupted, which would necessarily affect the industry's credibility in the eyes of the public.

Here, similar to New Jersey's Casino Control Act, the Act requires that its mandates be carried out in recognition of the public policy purposes the Act was meant to serve. Section 1102 of the Act, 4 Pa. C.S. § 1102, outlines the public policy purposes to be served by the Act, one of which provides: "The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." Despite Sonic Services' contentions that the public would not lose confidence in the integrity of gaming because (1) it has no involvement in Parx's gaming services; (2) Brescio has no control over Sonic Services; and (3) Sonic Services, through Giammarino, had no actual knowledge of Brescio's ties to organized crime, such considerations do not factor into this determination. The court's discussion in *International Union Local 54* is particularly persuasive in that our main focus must be on the effect that the offending association has on the policies to be served by the Act—*i.e.*, protecting the public through ensuring the integrity of gaming in this Commonwealth. Given that the Board found that Sonic Services, through Giammarino, associated with a figure who is a reputed member of an organized crime ring, the Board did not err in concluding that such an association would tarnish the integrity of gaming to the public.

## IV.  CONCLUSION

Based on the discussion above, we affirm the Commission's adjudication in so much as it concludes that Sonic Services is an unsuitable party for registration due to its association, through Giammarino, with Brescio.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Sonic Services, Inc.,                               :
                            Petitioner      :
                                                  :
             v.                                    :   No. 1698 C.D. 2018
                                                  :
Pennsylvania Gaming Control Board,     :
                           Respondent      :

## **O R D E R**

AND NOW, this 9th day of October, 2019, the order of the Pennsylvania Gaming Control Board (Board) is affirmed only with respect to the Board's conclusion that Sonic Services, Inc. is an unsuitable party for a registration under the Pennsylvania Race Horse Development and Gaming Act due to its association, through Michael Giammarino, with John Brescio.

                                            _____
                                            P. KEVIN BROBSON, Judge